# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Eugene Christopher Banks,

        Plaintiff,

    v.

Cal R. Ludeman, Benson, Nancy
Johnston, Greg Carlson, Brian
Ninneman, Thomas Lundquist, Allison
Ecklund, in their individual and official
capacity,

        Defendants.

Civil No. 08-5792 (MJD/JJK)

**REPORT AND
RECOMMENDATION**

---

Eugene Christopher Banks, 1111 Highway 73, Moose Lake, Minnesota, 55767,
*pro se*.

Cara M. Hawkinson, Esq., Assistant Minnesota Attorney General, counsel for
Defendants.

---

JEFFREY J. KEYES, United States Magistrate Judge

Plaintiff, a patient at the Minnesota Sex Offender Program, ("MSOP"), in

Moose Lake, Minnesota, has filed a Complaint seeking relief under 42 U.S.C.

§ 1983. (Doc. No. 1.) The seven named Defendants have filed a motion for

summary judgment, asking to have this action dismissed pursuant to Fed. R. Civ.

P. 56. (Doc. No. 69.) Plaintiff has filed an opposition to that motion, (Doc.

Nos. 82-83), and Defendants have filed a reply to Plaintiff's response. (Doc.

No. 84.)

The matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, this Court recommends that Defendants' motion for summary judgment be granted in part, and denied in part.

## BACKGROUND

Plaintiff has a long and sordid criminal history, which began when he was nine years old. At that time, he "began to engage in sexual intercourse" with his seven-year old sister, and "he threatened or slapped her if she resisted." *In re Banks*, No. C3-00-272, 2000 WL 1146740, *1 (Minn. Ct. App. Aug. 15, 2000). Plaintiff has also been convicted of sexually assaulting a twelve-year old girl, and he has been accused of sexually assaulting a five-year old boy and a five-year old girl. *In re Banks*, No. C5-99-217, 1999 WL 451207, at *1 (Minn. Ct. App. July 6, 1999).

In 1998, Plaintiff was found to be a "Sexually Dangerous Person," ("SDP"), under Minnesota law. *See* Minn. Stat. § 253B.02, subd. 18b.[1] Based on that determination, Plaintiff was civilly committed to MSOP for an indeterminate term. Plaintiff was detained at the MSOP facility in Moose Lake, Minnesota, at all times relevant to this action, and he remains confined there at this time.

Plaintiff recently sought to be discharged from the MSOP, but his request

---

[1] Minn.Stat. § 253.02, subd. 18b defines a SDP as "a person who: (1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

was denied.  The evidence presented at the hearing on Plaintiff's discharge

petition showed that:

> MSOP has diagnosed [Plaintiff] with pedophilia, paraphilia, drug and
> alcohol abuse in a controlled environment, anti-social personality
> disorder, and narcissistic personality disorder.  Since being
> committed, appellant has refused to participate in sex-offender
> treatment. [Plaintiff] has continued to engage in behavior indicating
> an interest in children, including possession of a picture of a naked
> child, possession of letters exploiting sexual violence and physical
> and sexual abuse of children, and communications with two different
> 15-year-old boys.  During virtually the entire time of his commitment,
> Plaintiff has threatened and assaulted MSOP staff.  In a report dated
> August 7, 2007, Plaintiff's treatment team at MSOP concluded that
> he is at high risk for reoffending because of his current level of
> psychopathy, continued sexual deviancy and rule violations in an
> institutional treatment setting, failure to participate in treatment,
> inability to identify his sex-offending risk factors, and the presence of
> a large number of static risk factors.

*Banks v. Ludeman*, No. A08-2024, 2009 WL 1182314, at *1 (Minn. Ct. App. May

5, 2009), *rev. denied*, (July 22, 2009).

Plaintiff commenced the present § 1983 action in October 2008.  He is

attempting to sue seven employees of the State of Minnesota, who are involved

in the MSOP.  Four of the named Defendants work in supervisory capacities.

These four Defendants, referred to hereafter collectively as "the Supervisory

Defendants" are (1) Cal R. Ludeman, the Commissioner of the Minnesota

Department of Human Services; (2) Dennis Benson, the Chief Executive Officer

of MSOP; (3) Nancy Johnston, the Director of the MSOP facility located in St.

Peter, Minnesota; and (4) Greg Carlson, the Director of the MSOP facility at

Moose Lake, Minnesota. The other three Defendants work more directly with MSOP patients, including Plaintiff. These three Defendants are (1) Brian Ninneman, a supervisor of the Behavioral Therapy Unit, ("BTU"), at the MSOP facility in Moose Lake; (2) Dr. Thomas Lundquist, a "Clinical Director" at the MSOP facility in Moose Lake; and (3) Allison Ecklund, a "Clinician" at the MSOP facility in Moose Lake.[2]

Plaintiff's current lawsuit stems from a series of confrontations between Plaintiff and various MSOP staff members, which occurred at the MSOP facility in Moose Lake between November 2006 and October 2008. On several occasions that are described in Plaintiff's Complaint, MSOP staff members allegedly seized, or threatened to seize, items of Plaintiff's personal property that were considered to be "contraband" under MSOP regulations. Most of the items at issue were magazines, catalogs, or videos that allegedly contained pictures deemed to be sexually provocative. Two of the items at issue were T-shirts that bore pictures or words that were deemed to be inappropriate for MSOP.

The specific incidents, and the items involved in each of those incidents, are described in paragraphs 1-17 of the "Statement of Claim" section of Plaintiff's

_____

[2] The Defendant identified in the Complaint as "Allison Ecklund" has changed her name to "Allison Collins." (Doc. No. 74, Aff. of Allison Collins F/K/A Ecklund ¶ 1.) However, she is identified in the Complaint as Allison Ecklund, she was known as Allison Ecklund during all of the events giving rise to this lawsuit, and she is most often referred to as Allison Ecklund in the current record. Therefore, with due respect for this Defendant's name change, the Court will refer to her as "Ecklund" herein.

Complaint. The incidents are also summarized in a previous Report and Recommendation ("R&R") in this case. (Doc. No. 14, March 11, 2009 R&R at 2-3.) The various incidents are discussed in greater detail below, to the extent needed to resolve Defendants' summary-judgment motion.

The items at issue in this case—i.e., the various publications and T-shirts that the MSOP staff took, or threatened to take, from Plaintiff—were deemed to violate (or possibly violate) the MSOP regulations that are intended to foster a safe and therapeutic environment at MSOP. Most of the items were problematic because the MSOP staff thought they violated MSOP's "Media Policy" regulations.

The MSOP Media Policy was created pursuant to Minn. Stat. § 246B.04, subd. 2, which requires that:

> The commissioner [of the Minnesota Department of Human Services] shall prohibit persons civilly committed as sexual psychopathic personalities or sexually dangerous persons under section 253B.185 from having or receiving material that is obscene as defined under section 617.241, subdivision 1, material that depicts sexual conduct as defined under section 617.241, subdivision 1, or pornographic work as defined under section 617.246, subdivision 1, while receiving services in any secure treatment facilities operated by the Minnesota sex offender program or any other facilities operated by the commissioner.

(Doc. No. 75, Aff. of Cara Hawkinson ¶ 3, Ex. 1.) The Media Policy states that it is intended to:

> provide a therapeutic living environment for patients in the [MSOP] that enhances their rehabilitation, to provide a safe and secure

5

environment for all persons in MSOP facilities, and to comply with the provisions of Minnesota Statutes section 246B.04, subdivision 2, by restricting patients from possessing obscene, pornographic, or other prohibited materials in a way that is consistent with the constitutional rights of civilly-committed patients.

(*Id.*)  (All future references to the Media Policy will be cited as "MP at __.")

The Media Policy includes a "General Statement" section that expressly acknowledges the First Amendment rights of MSOP patients.  (MP at 1 ("Civilly committed patients retain their First Amendment rights, unless those rights are restricted for important and specified treatment or safety reasons").)  The Media Policy also includes a "Procedures" section that establishes three categories of materials: (1) "Prohibited Materials"; (2) "Counter-Therapeutic Materials"; and (3) "Permitted Materials."  (MP at 2-3.)

Prohibited materials are items that MSOP patients are strictly forbidden to possess.  Such items include "obscene materials" as defined by Minnesota statutes, illegal materials like child pornography, and pictures and videos that either display "human genitalia in a lewd and explicit fashion," or are otherwise sexually provocative.  (MP at 2.)

Counter-therapeutic materials are items that are not strictly prohibited, but are antithetical to the rehabilitation of either (a) the particular patient who possesses the item, or (b) a significant number of other patients who might encounter the item.  Such counter-therapeutic items include "[m]aterials depicting nudity, sexual contact, sadomasochistic abuse, masturbation or excretory

functions." (MP at 3.) MSOP patients are discouraged from possessing counter-therapeutic materials, but they are allowed to do so. If a patient elects to retain an item that is counter-therapeutic, that decision is noted in his records. (MP at 3.) "Permitted materials" are items that are not classified as either prohibited or counter-therapeutic. (MP at 3.)

The MSOP has a "Media Review Team" ("MRT") that evaluates items that could be viewed as contraband under the Media Policy. The MRT consists of "[d]esignated staff members who are trained . . . to assess reading materials, pictures and videos." (MP at 1.) The procedure for identifying contraband that is subject to the Media Policy is summarized as follows:

> Reading materials and pictures are scanned for content by MSOP staff members upon arrival. In addition, patient computers, media, media equipment and other possessions are subject to searches to ensure compliance with this procedure. Items suspected of containing prohibited or counter-therapeutic material will be reviewed by the Media Review Team to determine whether they contain prohibited or counter-therapeutic material. The Program Administrator, Clinical Director and/or their designees will make the final determination as to the classification of material when requested to do so by the Media Review Team or the patient.

(MP at 3.) The Media Policy also includes an appeal process. A patient who wants to challenge an MRT decision is required to file a formal written grievance. (MP at 5.)

After an item is finally determined to be "prohibited," the affected patient is given a minimum of five business days to destroy it, send it to someone outside

of the MSOP, or make arrangements to have it picked up by someone who will take it away from the MSOP.  (Doc. No. 77, Aff. of Thomas Lundquist ¶ 5.[3])  If the patient does not properly dispose of a prohibited item, it will be destroyed by the MSOP staff.  (*Id.*)

Between November 2006 and October 2008, Plaintiff possessed numerous items that were suspected to be contraband under the MSOP Media Policy. MSOP staff confronted Plaintiff about suspected contraband on several occasions.  Some items were seized from Plaintiff and destroyed; some items were seized and sent away from the MSOP; and some items were seized, but later returned to Plaintiff, subject to certain restrictions on his ability to use them. At least one item was not actually seized, but still generated a controversy that ultimately caused Plaintiff to be disciplined.  (Doc. No. 1, Compl. ¶¶ 15-16.)  In the present lawsuit, Plaintiff claims that Defendants violated his federal constitutional rights during the various incidents described in his Complaint.  He claims that Defendants violated his right to free speech under the First Amendment, his right to protection from unreasonable searches and seizures under the Fourth Amendment, and his right to due process under the Fourteenth Amendment.[4]

---

[3] The Affidavit indicates that the five-day time limit is "not strictly enforced," and that patients normally are given additional time to dispose of prohibited items.

[4] Plaintiff originally asserted due process rights under the Sixth and Eighth Amendments, but the Court previously addressed that error, and construed Plaintiff's

Defendants previously moved to dismiss Plaintiff's Complaint pursuant to

Fed. R. Civ. P. 12(b)(6), contending that Plaintiff's Complaint did not state a

cause of action on which relief could be granted. The gist of Defendants' prior

motion was that the MSOP Media Policy was fully constitutional, on its face.

Defendants argued that Plaintiff failed to plead an actionable claim, because the

Media Policy was not unconstitutional. However, this Court found that

Defendants had misunderstood Plaintiff's claim. This Court explained that:

> Plaintiff does not contend that the [MSOP] cannot ban obscene,
> pornographic, or sexually explicit material, nor material which is
> properly deemed counter-therapeutic. (Doc. No. 11, Pl.'s Objection
> to Defs.' Mot. To Dismiss ('Pl.'s Objection') at 2.) Rather, he
> contends that none of the confiscated material falls into that class of
> material that may be lawfully seized. Plaintiff 'is not challenging the
> constitutionality of Minn. Stat. 246B.04, Subd. 2, he is contending
> that the [MSOP]'s interpretation, and the implementation of the
> statute violates his constitutional rights.' (*Id.*) . . . Given the
> limitations inherent in our review of a motion to dismiss, we must
> assume that Plaintiff's allegations are true, and that the materials
> described in the Complaint were, in fact, arbitrarily banned and there
> was no fair application of any otherwise constitutionally valid policy.

(Doc. No. 14, March 11, 2009 R&R at 8.[5]) This Court also previously suggested

that Defendants could not defeat Plaintiff's claims, unless they presented

evidence, in a summary-judgment motion or at trial, showing that the disputed

---

due process claim to be based on the Fourteenth Amendment. (Doc. No. 14, March
11, 2009 R&R at 11-15.)

[5] Plaintiff obviously accepts this Court's characterization of his claim, as he
asked the District Court Judge to adopt the R&R "in its entirety." (Doc. No. 18, Pl.'s
Resp. to Def.'s Objections to Report and Recommendation 1, 3.)

items described in Plaintiff's Complaint were, in fact, properly sanctionable under the MSOP Media Policy. (*See id.* at 9 (noting that "Defendants allude to the program regulations prohibiting sexually explicit material, but *we have no way of knowing whether or how such regulations were applied* in the decision to ban [the] materials" described in Plaintiff's Complaint) (emphasis added).)

Defendants' current summary-judgment motion is supported by several affidavits and exhibits that provide a more complete record of the facts giving rise to Plaintiff's claims. Based on that more complete record, this Court now considers whether Defendants have adequately demonstrated that they did not violate Plaintiff's constitutional rights by interfering with his possession of the items described in his Complaint.[6]

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

_____

[6] Unfortunately, it appears that Defendants still fail to appreciate the true nature of Plaintiff's claims. They have made a considerable effort to show that the MSOP Media Policy is *facially* constitutional. (*See* Doc. No. 71, Defs.' Mem. in Supp. of Mot. for Summ. J. 25-33.) That effort, however, is largely wasted, because Plaintiff is not challenging the constitutionality of the policy *per se*. He claims that Defendants violated his constitutional rights because the policy was not properly applied to the particular items described in his Complaint. Defendants still have not fully addressed these claims, because they still have not explained why some of the items at issue were found to be contraband under the Media Policy. It is for this reason that Defendants' motion for summary judgment must be denied in part, as discussed more fully below.

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Id.* at 255.

## II. ANALYSIS

### A. Eleventh Amendment Defense

Defendants initially contend that Plaintiff's claims for damages, brought against them in their official capacities, are barred by the Eleventh Amendment. This argument was raised in Defendants' previous Rule 12(b)(6) motion to dismiss. This Court previously determined that although Defendants' Eleventh Amendment argument is technically correct, it accomplishes nothing, because

Plaintiff is suing Defendants in their individual capacities (as well as their official capacities), and the Eleventh Amendment does not bar Plaintiff's individual-capacity claims for damages. (*See* Doc. No. 14, March 11, 2009 R&R at 22.)

Defendants have not shown any reason why their previously rejected Eleventh Amendment argument should now be upheld. Thus, for the reasons discussed in the previous R&R (*id.*), this Court again concludes that Plaintiff's claims against Defendants cannot be dismissed altogether pursuant to the Eleventh Amendment.

### B. Claims Against Supervisory Defendants

Defendants previously asked this Court to dismiss Plaintiff's claims against the four Supervisory Defendants (Cal R. Ludeman, Dennis Benson, Nancy Johnston, and Greg Carlson), arguing that Plaintiff was attempting to hold them liable under the doctrine of *respondeat superior*. That argument was rejected, because this Court found that Plaintiff's claims against the Supervisory Defendants are not based on *respondeat superior*, but rather, Plaintiff is claiming that the Supervisory Defendants violated his constitutional rights because they personally directed their subordinates to perform the various actions giving rise to Plaintiff's lawsuit. (*See* Compl. at 7, ¶ 18 ("The defendants are also responsible for giving their staff the direction to confiscate media items from plaintiff, and to put him in 'protective isolation.'").) Before Defendants filed their current summary-judgment motion, there was nothing in the record to refute Plaintiff's

allegation that the four Supervisory Defendants directed their subordinates to commit the allegedly unconstitutional acts described in the Complaint. Thus, this Court previously determined that Plaintiff's Complaint stated an actionable § 1983 claim against the Supervisory Defendants, because Plaintiff alleged that "they directed the subordinates to apply the [Media] policy prohibiting possession of certain materials in an unlawful way." (Doc. No. 14, March 11, 2009 R&R at 16.)

However, the evidentiary record now before this Court clearly shows that, in fact, the Supervisory Defendants did not direct any of their subordinates to perform any of the acts giving rise to Plaintiff's lawsuit. (*See* Doc. No. 72, Aff. of Dennis Benson ¶¶ 4, 6; Doc. No. 73, Aff. of Greg Carlson ¶¶ 4, 13; Doc. No. 76, Aff. of Nancy Johnston ¶ 4.) Plaintiff has filed no evidence that contradicts this evidence provided by Defendants' affidavits. Thus, the record shows plainly, and without refutation, that the Supervisory Defendants did not direct any of their subordinates to seize any of the items described in Plaintiff's Complaint, nor did they otherwise personally direct anyone to perform any of the actions giving rise to Plaintiff's lawsuit.

Based on the evidence of record, no jury could reasonably determine that any one of the Supervisory Defendants was personally responsible for any violation of Plaintiff's constitutional rights. Therefore, this Court will recommend that summary judgment be granted in favor of the four Supervisory Defendants, and that this action be dismissed as to each of those particular Defendants.

13

**C. Claims Against Defendants Lundquist, Ninneman, and Ecklund**

Plaintiff's remaining claims against the non-Supervisory Defendants (i.e., Defendants Thomas Lundquist, Brian Ninneman, and Alison Ecklund), are set forth at paragraphs 4, 5, 6, 8, 12, and 15 of the Complaint.[7]  Each of those paragraphs describes a separate occasion when one or more of the non-Supervisory Defendants allegedly seized, or threatened to seize, some item of personal property from Plaintiff.  Because these six incidents involve different facts and different parties, this Court addresses each one separately.

**(i) Paragraph 4 – "The Adventure of Photography"**

In paragraph 4 of the Complaint, Plaintiff alleges that on October 30, 2007, a MSOP staff member seized a DVD entitled "The Adventure of Photography: 150 years of the Photographic Image" from him.  According to Plaintiff, Defendant Lundquist deemed that DVD to be a prohibited item under the MSOP Media Policy.  Plaintiff was ordered to send the DVD out of the institution within five days.  Plaintiff claims that Lundquist violated his First and Fourth Amendment rights by depriving him of the DVD.

Although Defendant Lundquist has filed an affidavit in support of the pending motion for summary judgment, that affidavit makes no mention of the DVD at issue.  Defendants have submitted a one-page document, which appears

---

[7]  None of the other paragraphs in the Complaint purport to state any claim against the non-Supervisory Defendants.

to confirm that a DVD entitled "The Adventure of Photography" was seized from Plaintiff on October 30, 2007, and that "disposition" of the item occurred on November 30, 2007.  (Doc. No. 75, Aff. of Cara Hawkinson ¶ 4, Ex. 2.)  However, that document does not describe the DVD, and it does not explain why the DVD was seized and discarded.

As previously noted, Defendants have argued that the MSOP Media Policy is constitutional on its face.  That argument alone, however, does not adequately address the claim that Plaintiff has presented in paragraph 4 of his Complaint, because Defendants have not shown that the DVD described in paragraph 4 of the Complaint actually was prohibited by the Media Policy.  It could, perhaps, be inferred that the DVD was seized and discarded because it contained images proscribed by the Media Policy, but Defendants have not presented any evidence to support such an inference.

If the DVD did not contain content prohibited by the Media Policy, then the constitutionality of the Media Policy has no discernible bearing on the vitality of Plaintiff's claim.  The Media Policy may be constitutional on its face, but that is not significant unless the DVD actually contained material barred by the Media Policy.  This Court has already apprised Defendants that they cannot defeat a plaintiff's First Amendment claims by merely "assert[ing] the general constitutionality of the institution's policies without ever addressing their application in a particular case."  (Doc. No. 14, March 11, 2009 R&R at 9.)

This Court has no evidentiary basis to conclude that the DVD contained any prohibited content, and this Court cannot conclude that Defendant Lundquist had a legitimate reason to dispose of the DVD.[8]  Defendants have failed to sustain a movant's burden on summary judgment of "informing the district court of the basis for its motion" and identifying "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Thus, this Court cannot presently recommend that Defendant Lundquist should be granted summary judgment on the § 1983 claim brought against him in paragraph 4 of Plaintiff's Complaint.

### (ii) Paragraph 5 – "Spread Magazine" Shirt

Plaintiff next claims that his constitutional rights were violated in January 2008, when MSOP staff members, including Defendant Brian Ninneman, allegedly "seized" a shirt from Plaintiff.  (Compl. at 5, ¶ 5.)  The shirt bore the words "Spread magazine, illuminating the sex industry," and it allegedly was seized because it was "deemed to be 'Therapy Interfering Behavior.'"  (*Id.*) According to the Complaint, "[n]o disposition of that seizure was provided to plaintiff."  (*Id.*)  Plaintiff claims that this alleged incident "violate[d] plaintiff[']s 4th Amendment protection against unlawful seizures, his 6th [sic] Amendment right to

---

[8]  The lack of evidence also precludes this Court from accepting Defendants' qualified-immunity defense.  It is impossible to assess whether Defendant Lundquist could have reasonably believed the DVD was not constitutionally protected, because Defendants have not described the content of the DVD.

Due Process, his 1st Amendment right to free speech, and constitutes

censorship." (*Id.*)

Defendants have filed an affidavit by Brian Ninneman that contradicts

Plaintiff's description of this shirt-seizure incident in several important respects.

Ninneman's Affidavit shows that:

> On January 23, 2008, [Plaintiff] was wearing a pink t-shirt featuring a silhouette of a nude female with "Spread Magazine" written in red. That same day, the unit team met with [Plaintiff] to inform him that his t-shirt was counter-therapeutic according to the MSOP Media policy because of the nude figure and the Spread magazine logo, which supports prostitution . . . . [Plaintiff] was informed that he must wear the t-shirt only in his room or cover the t-shirt when he is outside of his room. According to the meeting notes, [Plaintiff] responded by telling unit staff he 'doesn't want to hear any bullcrap,' and that 'the only ones bothered are the staff.' [Plaintiff] also told treatment staff to 'take the treatment and stick it up your ass.'

(Doc. No. 78, Aff. of Brian Ninneman ("Ninneman Aff.") 3, ¶ 8.)

Defendant Ninneman's Affidavit further states that:

> [Plaintiff] continued to wear the counter-therapeutic t-shirt on the unit through mid-morning on January 24, 2008, when he changed into a different shirt . . . . In the evening on January 24, 2008, [Plaintiff] filed a grievance. On January 25, 2008, MSOP staff met with [Plaintiff] to discuss his grievance. On February 9, 2008, [Plaintiff's] grievance was dismissed because items which are deemed counter-therapeutic, like the t-shirt, must be used only in the privacy of [Plaintiff's] room as was explained to [Plaintiff] at his team meeting.

(*Id.* at 3-4, ¶ 9.[9])

---

[9] The facts recited in Ninneman's Affidavit are supplemented by various MSOP staff notes, which are attached to the Affidavit. Those notes confirm that

Plaintiff has offered no evidence to rebut Defendant Ninneman's explanation of the events pertaining to the Spread magazine t-shirt. Therefore, this Court finds that the t-shirt described at paragraph 5 of the Complaint was not actually taken away from Plaintiff. The shirt was determined to be "counter-therapeutic" for purposes of the Media Policy, so Plaintiff was discouraged from keeping it, but he was nevertheless allowed to possess it if he so chose. (*See* MP at 3.)

Based on the facts presented by Defendant Ninneman's Affidavit, it is readily apparent that Plaintiff cannot sustain either the Fourth Amendment claim, or the due process claim, that he has attempted to bring in paragraph 5 of his Complaint. Because the T-shirt was not seized, Defendant Ninneman cannot be liable for an unreasonable seizure of the shirt in violation of the Fourth Amendment, nor can Ninneman be liable for taking the shirt without due process in violation of the Fourteenth Amendment.

Whether Defendant Ninneman violated Plaintiff's First Amendment rights requires a bit more consideration. Defendants contend that Plaintiff's First

there was a silhouette of a nude female on Plaintiff's shirt, and that Plaintiff was allowed to keep the shirt and wear it, but he could not wear it outside of his room unless it was covered. The staff notes further indicate that Plaintiff was permitted to present a grievance regarding the shirt, and when he did so he was belligerent and abusive. He told the staff to "not force treatment down his throat, and to get him off the 'f[xxx]ing unit,'" and that staff would "have to 'beat me down' to get the shirt." (Ninneman Aff., Ex. 4.) Plaintiff also told the staff "'if you f[xxx] with others on the unit I will f[xxx] with you.'" (*Id.*)

Amendment rights must be evaluated under the guidelines set by *Turner v. Safley*, 482 U.S. 78 (1987). In that case, the Supreme Court considered how the First Amendment rights of prisoners could be limited by prison regulations and policies. The Court found that prisoners do not forfeit their First Amendment rights altogether by reason of their criminal convictions, but the rights of prisoners are necessarily subject to greater restrictions then the corresponding rights of non-prisoners. *Id.* at 84-85.

This Court recognizes that the Plaintiff in this case is not a prisoner, but a civilly committed detainee. However, the guidelines set by *Turner* were not tied directly to prisoners' criminal convictions, but to their institutionalization. In other words, prisoners' First Amendment rights are subject to greater restrictions not because of their convictions *per se*, but because prison administrators need to be able to perform their duties safely and effectively. Those same concerns are just as applicable in a civil commitment setting as in a prison setting. *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner *per se*, his confinement is subject to the same safety and security concerns as that of a prisoner"). Plaintiff's present custodians, like prison administrators, are engaged in "an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner*, 482 U.S. at 85. The factors that "counsel a policy of judicial restraint" when it comes to the management of prisons (*id.*), apply the same way to the

19

treatment of dangerous civilly committed sex offenders. Therefore, even though Plaintiff is not a prisoner, this Court finds that his First Amendment claims should be evaluated under the *Turner* guidelines. *See Semler v. Ludeman*, Civil No. 09-732 (ADM/SRN), 2010 WL 145275, at *8 (D. Minn. Jan. 8, 2010) (applying *Turner* to MSOP patient's First Amendment claims); *see also Ivey v. Mooney*, Civil No. 05-2666 (JRT/FLN), 2008 WL 4527792, at *4 (D. Minn. Sept. 30, 2008) (applying a "modified version" of the "deferential test outlined in *Turner*" to a First Amendment claim brought by an MSOP patient).

     *Turner* identified four factors that are to be considered when evaluating a detainee's First Amendment challenge to institutional regulations, policies, and practices:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 (8th Cir. 2004). The plaintiff bears the burden of proving that the *Turner* criteria should be resolved in his favor. *Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir.1991).

     *Turner* first requires that there must be a "valid, rational connection" between the restriction at issue and "the legitimate governmental interest put forward to justify it." 482 U.S. at 89. In this case, Defendants contend that the

MSOP Media Policy advances two legitimate objectives: "1) to create and maintain an atmosphere that is conducive to the therapeutic goals of treating dangerous sex offenders; and 2) to reduce the danger of sexual aggression toward other civilly committed patients or staff members." (Doc. No. 71, Mem. in Supp. of Defs.' Mot. for Summ. J. 27.) These two interests—rehabilitation and security—certainly constitute legitimate governmental interests. *Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993). Defendants further contend that the restrictions on counter-therapeutic materials, which are prescribed by the MSOP Media Policy, are rationally related to the stated objectives of rehabilitation and security. This Court agrees.

Defendants obviously believe that displaying images of nude females to sex offenders is detrimental to their rehabilitation, and inimical to institutional security, and thus it is reasonable to restrict such displays.[10] Other courts have accepted that proposition,[11] and Plaintiff has offered nothing to rebut it. Thus, this

_____

[10] In *Ivey*, the record included an affidavit from MSOP's director of psychological services, which stated that "(1) avoidance of situations that may trigger a relapse is a crucial aspect of MSOP's therapeutic program; [and] (2) sexually arousing material may trigger a relapse among certain patients." *Ivey*, 2008 WL 4527792, at *5. Although Defendants have not filed a similar affidavit here, the evidence from *Ivey* supports their current position on the application of *Turner*.

[11] In *Semler*, an MSOP detainee claimed a First Amendment right to possess nude photographs of a female friend. That claim was rejected, based on the court's determination that the MSOP Media Policy, "as applied to the images in question, satisfies the *Turner* factors." *Semler*, 2010 WL 145275, at *10. *See also Bahrampour v. Lampert*, 356 F.3d 969, 976 (9th Cir. 2004) (citing evidence that showed "there is a rational connection between the availability of sexually explicit

Court accepts Defendants' assertion that restricting the open display of nude female images is rationally related to the MSOP's legitimate interests in rehabilitating sex offenders, and providing a safe environment for the MSOP staff and patients.

The second *Turner* factor "is whether there are alternative means of exercising the right" at issue. 482 U.S. at 90. In this case, Plaintiff has not clearly identified the right that he wants to be able to exercise, so it is somewhat difficult to apply the second *Turner* factor. By finding Plaintiff's Spread magazine T-shirt to be "counter-therapeutic," rather than "prohibited," the MSOP has allowed Plaintiff to exercise his First Amendment rights to a significant degree. Plaintiff can still possess his shirt, he can view it privately for his own personal gratification, and he can wear it – provided he covers it when he leaves his room. If Plaintiff is seeking to exercise his First Amendment rights in some other way (presumably by displaying the shirt to others), he has not shown how that could

---

materials and harmful inmate behavior such as rape and other forms of sexual predation")*; Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (noting that "inmates have used nude photographs to draw anatomical comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights and disturbances by the inmates and created a security risk for both inmates and jail employees; to draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers"); *Wickner v. McComb*, Civil No. 09-1219 (DWF/JJK), 2010 WL 3396918, at *5 (D. Minn. July 23, 2010) (finding "that there is a rational connection between" a prison policy barring inmates from possessing nude images "and the legitimate penological interests in maintaining prison security, rehabilitating sex offenders, and reducing sexual harassment of prison guards").

be done without adversely affecting the legitimate objectives of the Media Policy. Plaintiff has not suggested any "alternative means" of exercising the right he is asserting (whatever it might be), that would not undermine the MSOP's legitimate interests in rehabilitation and security. Therefore, Plaintiff has not satisfied his burden with regard to the second *Turner* factor.

The third *Turner* factor requires this Court to consider how the MSOP's staff and patients might be affected if Plaintiff's First Amendment rights were accommodated according to his own wishes. As the Court explained in *Turner*, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." 482 U.S. at 90. Here, the "ripple effect" is critical. By classifying Plaintiff's T-shirt as "counter-therapeutic,"—thus allowing Plaintiff to wear the T-shirt in his own room but requiring him to cover its nude imagery outside his room—rather than prohibiting it altogether, the MSOP has said to Plaintiff, in effect, "you can impair your own prospects for rehabilitation, but you cannot impair anyone else's chances." The third *Turner* factor requires the Court to be "particularly deferential" to the MSOP's concerns about the "ripple effect" of Plaintiff's Spread magazine T-shirt. With such deference in mind, this Court finds that the third *Turner* factor weighs heavily in favor of Defendant Ninneman.

The fourth *Turner* factor requires the Court to consider whether there are

any "ready alternatives" to the regulation at issue, which would allow Plaintiff to exercise his First Amendment rights as he wishes, without adversely affecting the objectives of the regulation. Plaintiff has not suggested any such alternative form of regulation, and none is apparent to this Court. The MSOP has designed its Media Policy so that patients can exercise their First Amendment rights to the greatest extent that is consistent with the MSOP's mission and responsibilities. That principle was followed when Defendant Ninneman applied the Media Policy to Plaintiff's Spread magazine T-shirt. Because Plaintiff has not identified any "ready alternative" to Defendant Ninneman's application of the Media Policy (short of ignoring the Media Policy altogether), the Fourth *Turner* factor also weighs in Ninneman's favor.

Thus, applying *Turner* to Plaintiff's T-shirt claim (paragraph 5 of the Complaint), this Court finds that the MSOP Media Policy was applied in a manner that did not violate Plaintiff's First Amendment rights. This Court therefore recommends that Defendant Ninneman is entitled to summary judgment on that claim.

### (iii) Paragraph 6 – "Christies New York Photographs"

In paragraph 6 of the Complaint, Plaintiff claims that his constitutional rights were violated on January 24, 2008, when a MSOP staff member seized his copy of a catalog identified as "Christies New York Photographs, Sale Catalog # 1968" ("Christies catalog #1968"). Defendant Lundquist allegedly "deemed this catalog

'prohibited' due to nudity," (Compl. ¶ 6), and as a result, the catalog apparently was discarded. Plaintiff claims that Defendant Lundquist' actions violated his rights under the First and Fourth Amendments.

Defendant Lundquist's Affidavit confirms that Christies catalog #1968 "was reviewed by the Media Review Team, which determined that this item was prohibited." (Doc. No. 77, Aff. of Thomas Lundquist ("Lundquist Aff.") 2, ¶ 6.) More importantly, the Affidavit shows exactly why Christies catalog #1968 was found to be prohibited – namely, because it "had twenty-eight pages of nude photographs with clear visible genitalia of adult females, adult males and minor children." (*Id.*) A separate MSOP report submitted with Lundquist's Affidavit reiterates that Christies catalog #1968 contains "infant nudity with clearly visible genitals," "full frontal nudity of females," "nudity of minor children," and other images of "female genitalia." (Lundquist Aff., Ex. 1.)

It is readily apparent that Christies catalog #1968 includes content that is "prohibited" by the MSOP Media Policy. (*See* MP at 2, §§ A.1. and A.7.b.) Plaintiff has offered no evidence or argument contradicting that proposition. Thus, this Court finds that the "Christies New York Photographs, Sale Catalog # 1968" described at paragraph 6 of the Complaint was proscribed by the MSOP Media Policy. Furthermore, applying the Media Policy to that publication did not violate Plaintiff's constitutional rights under the First or Fourth Amendments.

Using the analysis prescribed by *Turner*, this Court has already determined

that Plaintiff does not have an actionable First Amendment right to display images of nude women to other MSOP patients. (*See* "Discussion," at pp. 16-21, *supra*.) Using the same analysis here, this Court further finds that Plaintiff does not have an actionable First Amendment right to possess, even for his own private use, the images published in "Christies New York Photographs, Sale Catalog # 1968" – i.e., images of "infant nudity with clearly visible genitals," "full frontal nudity of females," "nudity of minor children," and other images of "female genitalia." (Lundquist Aff., Ex. 1.)

Citing the four *Turner* factors, Defendants assert that possession of the images at issue is properly prohibited by the MSOP Media Policy because: (1) the prohibition of such images at the MSOP is rationally related to the institution's mission, and its legitimate interests in protecting its staff and patients; (2) the MSOP patients can exercise their First Amendment rights by alternative means – namely, by possessing other materials that are not so extremely graphic and provocative; (3) accommodating Plaintiff's expectations, by allowing inmates to possess the type of images at issue, would have a substantial, and very negative, "ripple effect" on the staff and patients at the MSOP; and (4) prohibiting the images at issue is not an "exaggerated response" to the MSOP's legitimate concerns. Plaintiff has offered no meaningful opposition to those assertions, and this Court finds them to be persuasive. Moreover, at least one other court has already determined that banning sexually explicit materials at the MSOP is not

actionable under the First Amendment. *See Semler*, 2010 WL 145275, at *10 (finding that, under *Turner*, the MSOP policy was constitutional when applied to prohibit patient's "receipt of photographs of nude female breasts and full-frontal genitalia"). Thus, this Court concludes that Plaintiff cannot sustain a First Amendment claim based on seizure of the "Christies New York Photographs, Sale Catalog # 1968."

Nor can Plaintiff sustain a Fourth Amendment claim based on the seizure of the catalog at issue. The Fourth Amendment proscribes only *unreasonable* searches and seizures. Given the salacious nature of the images contained in the catalog, it was not unreasonable for the MSOP officials to remove that catalog from the MSOP patient population. No reasonable factfinder could conclude that it is "unreasonable" to seize such sexually explicit photographs from a civilly-committed sex offender who is confined, in company with other sex offenders, in an institution that is supposed to provide rehabilitative treatment. Thus, this Court concludes, as a matter of law, that Plaintiff cannot sustain a Fourth Amendment claim against Defendant Lundquist (or anyone else), based on the seizure of the "Christies New York Photographs, Sale Catalog # 1968."

### (iv) Paragraph 8 – Christies New York Photos 2113 and 2020

Paragraph 8 of the Complaint pertains to two catalogs identified as "Christies New York Photograph catalogs 2113 and 2020," (hereafter "Christies catalog 2113" and "Christies catalog 2020"). Those catalogs were taken from

27

Plaintiff on March 20, 2008, because the MSOP staff suspected that they contained contraband materials. Plaintiff alleges that Defendant Allison Ecklund violated his constitutional rights by ordering that the catalogs be sent out of the MSOP or destroyed. (Compl. ¶ 8.)

The MRT reviewed Christies catalog 2113, "and found that it featured multiple images of human genitalia in lewd depictions of sexual violence or of real or simulated sex acts." (Doc. No. 74, Aff. of Allison Ecklund ("Ecklund Aff.") ¶ 8, Ex. 2.) Because of that content, Christies catalog 2113 was found to be prohibited material under the MSOP Media Policy, and Plaintiff was notified that the catalog would have to be sent out of the prison. (*Id.* ¶¶ 8, 10.)

Christies catalog 2020 was reviewed by Defendant Ecklund, and she determined that it did not contain any contraband material. Therefore, that catalog was returned to Plaintiff on March 22, 2008. (*Id.* ¶ 9, Ex. 1.[12])

This Court finds that Plaintiff is unable to sustain the claims presented at Paragraph 8 of his Complaint. The record shows that Christies catalog 2020 was seized from Plaintiff because there was reason to suspect that it contained contraband material. The MSOP staff found prohibited material in other catalogs

---

[12]  Allison Ecklund's Affidavit includes a brief ambiguous statement that suggests that both Christies catalog 2113 and Christies catalog 2020 were sent away from the MSOP. (Ecklund Aff., ¶ 11.) However, if Christies catalog 2020 actually was sent away from the MSOP, it appears that Plaintiff must have chosen to do that voluntarily, because the record clearly indicates that Christies catalog 2020 was found *not* to be contraband, and was returned to Plaintiff. (Ecklund Aff., ¶ 9, Ex. 1.)

by the same publisher (i.e., Christies catalog 1968, and Christies catalog 2113), so the seizure of Christies catalog 2020 cannot constitute an "unreasonable seizure" proscribed by the Fourth Amendment.  Furthermore, Christies catalog 2020 was promptly returned to Plaintiff after the MSOP staff determined that it did not contain contraband material.  Thus, this Court finds that Plaintiff could not sustain either a Fourth Amendment claim or a First Amendment claim against Defendant Ecklund, based on the alleged seizure of Christies catalog 2020.

The record also clearly shows that Christies catalog 2113 contained material that clearly was prohibited by the MSOP Media Policy.  (*See* Ecklund Aff. ¶ 8, Ex. 2.)  The contraband content of Christies catalog 2113 is the same type of graphic sexual images that were found in catalog 1968, discussed at pp. 21-24, *supra*.  Therefore, this Court finds that Plaintiff's claims based on the seizure of Christies catalog 2113 should be dismissed for the same reasons that his claims based on Christies catalog 1968 must be dismissed.

### (v) Paragraph 12 – "Pacific Island Ladies"

In Paragraph 12 of the Complaint, Plaintiff alleges that the MSOP staff deprived him of a "singles magazine" entitled "Pacific Island Ladies."  He alleges that Defendant Ecklund found the magazine to be contraband, and therefore ordered that it be destroyed.  Plaintiff claims that Ecklund's alleged actions violated his constitutional rights under the First and Fourth Amendments.

Ecklund's Affidavit confirms that on August 4, 2008, the MSOP staff

"secured a catalog titled 'Pacific Island Ladies,'" and that a "clinical team" determined that it contained "critical contraband" and should be destroyed. (Ecklund Aff. ¶¶ 12-14,   Exs. 3, 4.)  However, this Court finds nothing in Ecklund's Affidavit, or in any other part of the evidentiary record, that describes the content of the Pacific Island Ladies publication, or explains why it was found to be prohibited by the Media Policy.  It is therefore impossible for this Court to assess whether the Pacific Island Ladies publication was properly seized and destroyed.

The destruction of Plaintiff's Pacific Island Ladies publication may have been entirely warranted under the Media Policy, and entirely constitutional as well, but Ecklund has not yet substantiated that proposition.[13]  That being the case, this Court cannot presently recommend that the claim against Defendant Ecklund presented at Paragraph 12 of the Complaint be dismissed on summary judgment.

### (vi) Paragraph 15 – "Cocaine T-Shirt"

The claims presented at paragraph 15 of the Complaint pertain to another T-Shirt.  The shirt giving rise to the paragraph-15 claims apparently bore no images, but only the words "Cocaine, Prostitution, Crime, Warning Adults Only."

---

[13]  Once again, the lack of evidence also precludes this Court from accepting Defendants' qualified-immunity defense.  Perhaps it was reasonable for Defendant Ecklund to believe that she was not violating Plaintiff's constitutional rights, but that issue cannot be resolved when nothing is known about the content of the publication in question.

(Ninneman Aff.  ¶ 11.)  According to the Complaint, Plaintiff's T-shirt (referred to here as "the Cocaine shirt"), "promot[ed] an anti-drug move from the 1930's." (Compl. ¶ 15.)  On September 16, 2008, Plaintiff wore his Cocaine shirt outside of his room at the MSOP.  He was summoned to a meeting with MSOP staff members, who informed him that the Cocaine shirt "violated Unit Living Expectation and was determined to be critical contraband."  (Ninneman Aff. ¶ 11.) Plaintiff alleges that Defendants Ninneman and Ecklund "attempted to seize" the Cocaine shirt.  (Compl. ¶ 15.)  Defendant Ninneman says that the Cocaine shirt was not actually taken from Plaintiff, because he was wearing it, and "[g]enerally, staff do not physically restrain clients to obtain contraband clothing they are currently wearing."  (Ninneman Aff. ¶ 11.)

Plaintiff alleges that he "refused to waive his 1st Amendment right to free speech,"  (which presumably means that he refused to voluntarily surrender his Cocaine shirt), and he was therefore "consequenced, and placed in 'protective isolation' on several occasions over a one week period."  (Compl. ¶ 15.) According to Plaintiff, this violated his constitutional rights under the First, Fourth, Sixth, and Eighth Amendments.  (*Id.*)

Defendants' evidentiary submissions confirm that Plaintiff "was placed in Protective Isolation ("PI")[14] because he refused to turn over the [Cocaine shirt] . . .

---

[14]  The MSOP maintains a "Protective Isolation Unit," which is "a separate room" that apparently is isolated from the general patient population.  Patients are removed to the Protective Isolation Unit, (i.e., "placed in PI"), "as a means of

to the Media Review Team for review," and because he "made threatening remarks to staff." (Ninneman Aff. ¶ 12.) Defendants have submitted various staff notes and other MSOP records, which show that Plaintiff was repeatedly directed to surrender his Cocaine shirt and that he repeatedly refused to do so. (Ninneman Aff. ¶¶ 12, 13, Exs. 6, 7.) Plaintiff was also directed not to wear his Cocaine shirt outside of his room, and he wantonly violated that directive as well. (Ninneman Aff. ¶ 12, Ex. 6.) The MSOP staff repeatedly removed Plaintiff from PI, but when he refused to comply with staff directives regarding the Cocaine shirt, he was moved back into PI. (Ninneman Aff. ¶¶ 12, 13, Exs. 6, 7.) On one occasion when Plaintiff was being moved back to PI, he stated "I'm getting pissed and I'm gonna have to hurt somebody." (Ninneman Aff. ¶ 12, Ex. 7.)

Plaintiff's Complaint and Defendants' evidentiary submissions all indicate that the standoff over the Cocaine shirt lasted about a week. During that time Plaintiff was shuttled in and out of PI, because he continually flouted the MSOP staff directives – i.e., that (1) he must surrender the Cocaine shirt, and (2) if he refused to surrender the shirt, he must (at the very least) not wear it outside of his room. Finally, on or about September 23, 2008, Defendant Greg Carlson, the Director of the MSOP, was informed about the Cocaine shirt. After Carlson had an opportunity to personally inspect the shirt, he determined that it did not violate

_____

defusing or containing dangerous behavior that is uncontrollable by any other means." (Ninneman Aff. ¶ 12.)

the MSOP Media Policy, and he directed the MSOP staff to return the Cocaine shirt to Plaintiff.  (Doc. No. 73, Aff. of Greg Carlson  ¶¶ 11-12.)[15]

Plaintiff claims that his constitutional rights were violated during the dispute over the Cocaine shirt.  He specifically claims that Defendants Ninneman and Ecklund violated his constitutional rights to free speech, protection from unreasonable seizures, and due process.[16]  However, those claims cannot survive summary judgment.

This Court initially finds that Plaintiff's unreasonable seizure claim must be rejected, because his Cocaine T-shirt was not actually seized.  Plaintiff's due process claim must be rejected for the same reason.  Plaintiff alleges that Defendants Ninneman and Ecklund "*attempted* to seize" his T-shirt, but the record now shows that the shirt was not actually taken from him.  Therefore, Plaintiff cannot show that his T-shirt was taken from him in violation of his Fourth Amendment rights, or in violation of his right to due process.

Plaintiff also cannot show that he was assigned to Protective Isolation without the benefit of due process.  The record shows that Plaintiff was notified (more than once), that his T-shirt was not acceptable; he had several

_____

[15]  Evidently, Plaintiff must have agreed to surrender the shirt so that it could be inspected by Defendant Carlson, and after that inspection was completed, the shirt must have been returned to Plaintiff, to keep and wear, pursuant to Carlson's directive.

[16]  As previously mentioned, Plaintiff's anomalous references to the Sixth Amendment and the Eighth Amendment are construed to be due process claims.

opportunities to present a response; and ultimately, after a review by the MSOP Director, Defendant Greg Carlson, Plaintiff was allowed to retain the Cocaine shirt. Plaintiff has not identified any other procedural benefits that he purportedly should have been afforded in order to satisfy the Constitution's due process clause. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 888 (8th Cir. 2006) (rejecting the MSOP patient's due process claim, because he "received notice of why he was placed in protective isolation . . . and he had the opportunity to rebut the rationale at the review panel meeting;" and thus "he received the 'fundamental requisite[s]' of due process – notice and a right to be heard")*; Herts v. Smith*, 345 F.3d 581, 587 (8th Cir. 2003) ("[d]ue process generally requires that certain procedures be met; a plaintiff must receive adequate notice and the opportunity to be heard at a meaningful time and in a meaningful manner") (citations omitted).

The gist of Plaintiff's First Amendment claim is neither explained, nor entirely self-evident. Presumably, Plaintiff is asserting a free speech right to share the "message" of his T-shirt—"Cocaine, Prostitution, Crime, Warning Adults Only"—with the MSOP staff and patients. Plaintiff apparently is claiming that his First Amendment rights were violated because he was punished in retaliation for his attempts to exercise his right to free speech. For present purposes, this Court will assume (without deciding), that the Cocaine shirt is a form of expression that warrants some measure of protection under the First Amendment. However, this

34

Court finds that Plaintiff cannot sustain a First Amendment claim based on the events surrounding the Cocaine shirt.

The evidence shows that Defendants Ninneman and Ecklund did not actually ban the Cocaine shirt. At most, they merely expressed concern about the propriety of the shirt, and they directed Plaintiff to surrender it, so it could be subjected to a more extensive evaluation. According to Ninneman's Affidavit, Plaintiff was not punished for wearing the shirt, but rather, he "was placed in Protective Isolation ("PI") because he refused to turn over the 'Cocaine, Prostitution, Crime, Warning Adults Only' t-shirt to the Media Review Team *for review*." (Ninneman Aff. ¶ 12 (emphasis added).) Plaintiff was not sent to PI for exercising his First Amendment rights, but because (1) he failed to comply with a MSOP staff directive (i.e., that he should surrender the Cocaine shirt for review), and (2) he "made threatening remarks to staff." (*Id.*)

In a prison setting, a retaliatory-discipline claim is sustainable only if a prisoner establishes that "'(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline.'" *Haynes v. Stephenson*, 588 F.3d 1152, 1155 (8th Cir. 2009) (quoting *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007)). While recognizing once again that Plaintiff is not a prisoner, this Court finds no good reason why this same three-prong analysis should not apply to retaliatory-discipline claims brought by other state detainees, such as Plaintiff.

This Court has already assumed that Plaintiff's Cocaine shirt involved a constitutionally protected form of expression, and the record clearly indicates that Plaintiff was assigned to Protective Isolation as a disciplinary measure. However, Plaintiff cannot satisfy the third requirement of a retaliatory discipline claim – i.e., he cannot show that exercising his right to free speech was "the motivation for the discipline."

"To establish the third element of the prima facie case for retaliatory discipline . . . an inmate must show that *but for a retaliatory motive*" he would not have been disciplined. *Haynes*, 588 F.3d at 1156 (emphasis added). In this case, the record shows that Plaintiff was disciplined (i.e., sent to PI), because: (1) he disobeyed staff directives to submit his Cocaine shirt for a full evaluative review; and (2) he made threatening remarks to staff. Given this unrebutted evidence, no reasonable factfinder could conclude that Plaintiff was disciplined *solely* for trying to exercise his First Amendment rights. *Cf. Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010) (stating that inmate's First Amendment claim survived summary judgment because defendants offered no reason for adverse transfer that rebutted a compelling inference of retaliation).

Simply put, Plaintiff cannot satisfy the "but for" requirement of his retaliatory discipline claim. Therefore, Plaintiff's First Amendment claim pertaining to the Cocaine shirt cannot survive Defendants' summary-judgment motion.

## III. CONCLUSION

Based on the foregoing analysis, this Court reaches the following conclusions:

(1) All of Plaintiff's claims against the Supervisory Defendants, i.e., Cal Ludeman, Dennis Benson, Nancy Johnston, and Greg Carlson, should be dismissed.

(2) Plaintiff has not presented any potentially sustainable claim against Defendant Brian Ninneman, and this action should be dismissed as to him.

(3) Defendant Thomas Lundquist is not entitled to summary judgment on the claim against him that is presented at paragraph 4 of Plaintiff's Complaint.

(4) Defendant Allison Ecklund is not entitled to summary judgment on the claim against her that is presented at paragraph 12 of the Complaint.

In short, all of the claims presented in Plaintiff's Complaint, except the claim against Defendant Lundquist in paragraph 4, and the claim against Defendant Ecklund in paragraph 12, should be dismissed.

Finally, this Court notes that Plaintiff's opposition to Defendants' summary-judgment motion is anomalously identified as a "*Motion* to Deny Summary Judgement." (Doc. No. 82.) Having determined that Defendants' motion for summary judgment should be adjudicated in the manner outlined above, this Court recommends that Plaintiff's so-called "motion" should simply be denied as moot.

# RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Defendants' Motion for Summary Judgment (Doc. No. 69), be

**GRANTED IN PART** and **DENIED IN PART**;

2.  All of Plaintiff's claims against all Defendants be dismissed with

prejudice, except for: (1) the claim against Defendant Thomas Lundquist that is

presented at paragraph 4 of the Complaint; and (2) the claim against Defendant

Allison Ecklund that is presented at paragraph 12 of the Complaint; and

3.  Plaintiff's pending "Motion to Deny Summary Judgement" (Doc. No. 82),

be **DENIED AS MOOT**.


Date: October 4, 2010

                         *s/ Jeffrey J. Keyes*
                         JEFFREY J. KEYES
                         United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 18, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.